

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

Feb 26. 2013

FEB 2 6 2013

THOMAS G. BRUTON
CLERK, U.S DISTRICT COURT

THE UNITED STATES OF AMERICA, *ex rel.*
BURAK GEZEN,

                Relator-Plaintiff,

                v.

LAKE MI MOBILE DOCTORS, P.C. and
DIKE AJIRI,

                Defendants.

)
)
)
) No.
)
13cv1490
Judge James F. Holderman
Magistrate Judge Daniel G. Martin

)
) JURY TRIAL DEMANDED

## COMPLAINT

Relator BURAK GEZEN, on behalf of the UNITED STATES OF AMERICA, by and

through his attorneys and complaining of the defendants, LAKE MI MOBILE DOCTORS, P.C.

and DIKE AJIRI, states as follows

## INTRODUCTION

1.    Relator, Burak Gezen, brings this action on behalf of the United States of America for

treble damages, civil penalties, and other relief, based upon defendants' violations of the False

Claims Act, 31 U.S.C. §3729 *et seq.*

2.    As described in detail in this complaint, defendants are engaged in a multi-faceted

scheme to defraud the Medicare Program by presenting or causing to be presented false or

fraudulent claims for payment, and by making false statements and records material to false or

fraudulent claims in violation of the False Claims Act, 31 U.S.C. §§3729(a)(1)(A) & (B).

Among other things, defendants submit claims that result from the violation of the Federal

Anti-Kickback Statute, bill Medicare for their provision of medically-unnecessary services and for medically-unnecessary tests, and issue false certifications which enable other companies to bill Medicare for services that they could not otherwise charge to Medicare.

3.    The violations alleged herein all occurred on an ongoing and continuing basis up to and including the date of the filing of this lawsuit and are continuing to this day.

## JURISDICTION AND VENUE

4.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3730(b).  This Court also has jurisdiction pursuant to 28 U.S.C. §1345, which provides the district courts with original jurisdiction over all civil actions commenced by the United States of America.

5.    Venue is proper in the Northern District of Illinois pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b) because defendants can be found, reside, and/or transact business in this District and acts alleged herein occurred in this District.

6.    Relator has direct and independent knowledge of the information upon which these allegations are based and he voluntarily provided the information underlying his allegations to the United States before filing this complaint.  Further, the allegations and transactions upon which this action is based have not been publicly disclosed.

## THE PARTIES

7.    Relator Burak Gezen is a physician and former employee of Lake MI Mobile Doctors, P.C. ("Mobile Doctors").  Dr. Gezen is 2008 graduate of Virginia Commonwealth University School of Medicine.  He completed his residency in internal medicine at McGaw

2

Medical Center of Northwestern University in 2011. He subsequently completed a fellowship in hospice and palliative medicine at John H. Stroger Hospital of Cook County in 2012.

8. Dr. Gezen began work at Mobile Doctors on August 1, 2012. Mobile Doctors assigned to Dr. Gezen a caseload of patients who had previously been seen by other Mobile Doctors' physicians. Mobile Doctors scheduled Dr. Gezen to perform 12 to 14 home patient visits each day.

9. Dr. Gezen was paid by Mobile Doctors based on the number of patient home visits he performed. Every two weeks, Mobile Doctors provided Dr. Gezen with a written breakdown of how his pay for that period was computed. This breakdown confirmed that Dr. Gezen's base salary was comprised of a fixed portion of the amount of money that Mobile Doctors billed Medicare (and that Medicare paid Mobile Doctors) for each patient home visit that he conducted.

10. Dr. Gezen voluntarily resigned in December 2012 after he determined that Mobile Doctors' business practices and protocols routinely defraud the Medicare program and the company repeatedly interfered with his ability to provide care to his patients in a manner consistent with his medical judgment.

11. Defendant Lake MI Mobile Doctors, P.C., is an Illinois corporation that is headquartered in Chicago. Mobile Doctors is a rapidly expanding company with offices in Chicago, Indianapolis, Dallas, Austin, San Antonio, St. Louis, Kansas City, Phoenix, Detroit, Southfield (Michigan), and Flint (Michigan). Presently, Mobile Doctors has over 200 employees and physicians and performs over 7,000 house calls per month.

12. Mobile Doctors, which has announced plans to open an additional three to four new branches per year through 2018, has recently opened, or is soon to open, additional branches in Charlotte, Nashville, Philadelphia, and Louisville.

13. Relator estimates that Mobile Doctors employs roughly 12 physicians in its Chicago office, who see approximately 3,200 total patients throughout Chicago and Northwest Indiana.

14. Mobile Doctors' patients are primarily Medicare beneficiaries. Mobile Doctors states on its website that "[a]ll billing is done directly with Medicare Part B or with most other insurance companies." Mobile Doctors also maintains a "physician compare group practice profile" along with a list of its physicians on the Medicare Program's website.

15. Defendant Dike Ajiri is Mobile Doctors' Chief Executive Officer. Although he is not a physician, Ajiri controls and dictates Mobile Doctors' business practices and medical protocols. Ajiri started with Mobile Doctors in 1995 and became the company's CEO in 2000.

## DEFENDANTS' FRAUDULENT PRACTICES

I.   Mobile Doctors Bills for Medically-Unnecessary Services.

16. The Medicare program is a program administered by the United States Department of Health and Human Services ("HHS") that provides health insurance for persons aged 65 and older, certain younger people with disabilities, and people with end-stage renal disease. HHS, through the Center for Medicare and Medicaid Services ("CMS"), administers and supervises the Medicare program.

17. "Part A" of the Medicare program pays for hospitalization costs, services rendered by skilled nursing facilities, home health services, and hospice care. "Part B" of the Medicare program pays for physician services, outpatient hospital care, and other medical services such as physical and occupational therapy.

18. The house calls made by Mobile Doctors physicians to eligible Medicare beneficiaries fall within the definition of "physicians' services" that are reimbursable by Medicare Part B if the billed for services were medically indicated and necessary for the health of the patient.

19. Mobile Doctors prepared a daily schedule of the patients whom each of its physicians (including Dr. Gezen) were to visit at home. Dr. Gezen did not see his daily schedule or learn of the patients he was scheduled by Mobile Doctors to visit until he arrived at work each morning.

20. Per the direction of its CEO Ajiri, Mobile Doctors' practice and procedure is to schedule each of its patients for a home physician visit roughly every three weeks regardless of whether it is medically necessary for the patient to been seen by a Mobile Doctors physician on the scheduled date.

21. Mobile Doctors repeatedly scheduled Dr. Gezen to make physician home visits to patients who had no medical need to be examined by a physician on the date in question. In particular, Mobile Doctors scheduled Dr. Gezen to make what Dr. Gezen determined to be medically-unnecessary physician home visits to the following patients (identified by initials) on the following dates:

| Patient | Dates[1] when Dr. Gezen was scheduled for medically-unnecessary home visits |
|---------|------------------------------------------------------------------------------|
| F.T.  | September 18; October 9; November 2; November 20; and December 4; |
| S.D.  | October 9; October 26; and November 16; |
| J.D.  | October 1; October 26; November 27; |
| Do.B. | September 17, October 28; November 20; |
| Da.B  | September 17; October 30; and November 20; |
| S.M.  | October 19; November 16; |
| W.H.  | October 12; |

---

[1] All dates are from 2012.

| | |
|---|---|
| G.M. | October 12; |
| H.F. | November 8; |
| M.G. | September 18; October 9; November 2; |
| R.G. | November 2; |
| C.C. | September 27; November 6; |
| S.C. | September 27; |
| E.W. | November 13; |
| A.M. | September 18; October 26; December 4; |
| J.C. | November 26; |
| B.R. | November 26. |

The examples listed above are just a portion of the medically-unnecessary patient home visits that Mobile Doctors scheduled Dr. Gezen to make.

22. Mobile Doctors had been treating some of the patients listed above (such as F.T., Do.B., and H.F.) for years prior to when Dr. Gezen visited them despite the fact that they had no medical need for Mobile Doctors' services. Moreover, Dr. Gezen observed that some of Mobile Doctors' patients (including H.F.) had been previously diagnosed with OA (*i.e.*, osteoarthritis) to justify the medical need for their home visits even though they either did not have that condition or the condition was so mild that it did not limit their mobility.

23. Mobile Doctors scheduled physician home visits for its patients in order to boost the company's revenue by driving its physicians to make 12 to 14 home visits a day without regard for whether those patients had a medical need for a physician visit.

24. In November 2012, Dr. Gezen increased his efforts to schedule some of his patients for less frequent follow-up visits consistent with medical necessity. Mobile Doctors' Chicago Branch Manager Lisa Verona warned him that he should not lengthen the interval

between visits to patients because he would not have enough patients to maintain his target of 12

to 14 patient visits a day if he did so. Mobile Doctors' administrative staff also informed Dr.

Gezen that he was creating an "administrative nightmare" by altering the scheduling protocol

and he was told that he "cannot change the rules."

25. When Dr. Gezen noted in his patients' charts that it was medically appropriate for

the patients to receive a follow-up home visit six to eight weeks later, Mobile Doctors

disregarded his medical judgment and instead scheduled these patients for home visits only three

to four weeks later. As a consequence, Dr. Gezen's follow-up visits to these patients were not

medically necessary. The following patients were scheduled for medically-unnecessary follow-

up visits in disregard for Dr. Gezen's instructions:

a.     M.A. -- Dr. Gezen saw this patient on November 5[2] and noted in her chart
       that she should receive a six-week follow-up visit from Mobile Doctors.
       Instead, Mobile Doctors scheduled her for a medically-unnecessary
       follow-up visit only three weeks later on November 26.

b.     S.D. -- Dr. Gezen saw this patient on November 1 and noted in his chart
       that he should receive an eight-week follow-up visit from Mobile Doctors.
       Instead, Mobile Doctors scheduled him for a medically-unnecessary
       follow-up visit only three weeks later on November 26.

c.     J.C. -- Dr. Gezen saw this patient on November 1 and noted in his chart
       that he should receive an eight-week follow-up visit from Mobile Doctors.
       Instead, Mobile Doctors scheduled him for a follow-up visit only three
       weeks later on November 26.

d.     B.R. -- Dr. Gezen saw this patient on November 1 and noted in his chart
       that he should receive an eight-week follow-up visit from Mobile Doctors.
       Instead, Mobile Doctors scheduled him for a medically-unnecessary
       follow-up visit only three weeks later on November 26.

e.     D.K. -- Dr. Gezen saw this patient on November 1 and noted in her chart
       that she should receive an eight-week follow-up visit from Mobile
       Doctors. Instead, Mobile Doctors scheduled her for a medically-
       unnecessary follow-up visit roughly four weeks later on December 3.

---

[2] All dates are in 2012.

    f.      T.S. -- Dr. Gezen saw this patient on November 5 and noted in her chart that she should receive an eight-week follow-up visit from Mobile Doctors. Instead, Mobile Doctors scheduled her for a medically-unnecessary follow-up visit four weeks later on December 3.

    g.      D.J. -- Dr. Gezen saw this patient on November 5 and noted in her chart that she should receive an eight-week follow-up visit from Mobile Doctors. Instead, Mobile Doctors scheduled her for a medically-unnecessary follow-up visit less than four weeks later on November 29.

26. Because Mobile Doctors schedules its patients for physician home visits without regard for whether the visits are medically necessary, patients frequently cancel their visits. If two or more of a physician's scheduled patients cancel before 11:00 a.m., Mobile Doctors administrative staff will attempt to schedule other patients (specifically, patients who have recently cancelled visits or were simply not home at the scheduled time for a prior visit) as "add-on" patients so that the physician can hit their target number of visits. Mobile Doctors engages in this scheduling practice even though the Mobile Doctors physicians who make the home visits to the "add-on" patients do not have the charts of those patients available during their visits.

27. Mobile Doctors' practice of scheduling "add-on" patients also results in its physicians making medically-unnecessary home visits. For example, patient Da.B. cancelled his scheduled appointment on October 28, 2012 and was scheduled by Mobile Doctors as an "add-on" on October 30, 2012. Dr. Gezen determined that the October 30 physician home visit was not medically necessary and, further, that Da.B. was not an appropriate patient for Mobile Doctors' services.

28. Dr. Gezen estimates that 15-20% of the patients that Mobile Doctors scheduled him to visit had no medical need for home physician visits at all, and that an additional 20-25% had no medical need for physician visits every four weeks or less as scheduled by Mobile Doctors.

29.  On November 11, 2012, Dr. Gezen wrote Mobile Doctors CEO Ajiri an e-mail in which he stated that Mobile Doctors' "system appears to promote and perhaps encourage unneeded tests and home visits at the expense of Medicare." In his November 13, 2012 e-mail in response, Ajiri attempts to justify Mobile Doctors' scheduling protocol on the theory that having regularly-scheduled physician home visits -- medically necessary or not -- will save the Medicare program money by reducing the number of far more expensive in-patient hospitalizations for Mobile Doctors' patients.

30.  Dr. Gezen has personal knowledge that Mobile Doctors billed Medicare for all of his physician home visits within two weeks of when he made those visits. Each pay period, Mobile Doctors provided him with a printout which listed the number of "new" and "established" patients that Dr. Gezen treated and the dollar value of Dr. Gezen's compensation for each patient visit (which was a derivative of the amount that Mobile Doctors billed for and received from the Medicare program).

31.  In order to get reimbursed by Medicare for the provision of its services to each patient, Mobile Doctors is required to submit a claim for payment to Medicare. Specifically, Mobile Doctors is required to submit a CMS-1500 form, which among other things, identifies the dates and kinds of services provided and contains a certification that the information submitted is "true, accurate and complete" and the billed-for services were "medically indicated and necessary for the health of the patient."

32.  Moreover, because Mobile Doctors submits its claims for payment to Medicare electronically, Mobile Doctors was required to complete an Electronic Data Interchange Enrollment Form. As part of that Enrollment Form, Mobile Doctors was required to certify that it would submit "accurate, complete, and truthful" claims and to further acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment

9

under the Medicare or Section 1011 program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."

33. Every time Mobile Doctors billed Medicare for a medically-unnecessary physician home visit, Mobile Doctors made a false certification in support of its false or fraudulent claim in violation of the False Claims Act.

II.   Mobile Doctors Bills for Medically-Unnecessary Tests.

34. Out-patient clinical laboratory procedures and testing is reimbursable by Medicare Part B if the procedures and testing are medically necessary or indicated.

35. Mobile Doctors performs certain diagnostic testing for its patients in their homes. The tests offered by Mobile Doctors include echocardiograms, electrocardiograms (EKGs), general ultrasounds, arterial and venous dopplers, carotid dopplers, x-rays, blood draws, and pulse oximetry.

36. Mobile Doctors' protocol calls for its physicians to order a battery of tests for each new Mobile Doctors patient without consulting the patient's primary care physician (if any)[3] who would have ordered any medically-required tests on an ongoing basis. With respect to testing that involves imaging, Mobile Doctors orders as many tests as can conceivably be medically indicated for a patient's condition to ensure that Medicare will pay without regard to whether those tests are in fact medically necessary. Mobile Doctors also routinely orders a battery of blood tests for its new patients, again, without regard to whether the tests are in fact medically necessary.

---

[3] Roughly 50% of Mobile Doctors' new patients have primary care physicians.

37.  Mobile Doctors' protocol also directs Mobile Doctors' physicians to order tests for established patients if they have not had testing in a year or if they do not have any blood work in their charts.  Just as with many of the tests ordered for "new" patients, many of these tests for the "established" patients are not medically necessary.

38.  Mobile Doctors modified a "health management form" that Dr. Gezen created to help Mobile Doctors better serve its patients to include several spaces to note when an echocardiogram had last been performed.  Dr. Gezen found that Mobile Doctors' inclusion of several spaces on this form for the echocardiogram was particularly problematic because it suggested that a patient should receive several echocardiograms over the course of care.  In fact, routine echocardiograms are not part of any professional medical society's guidelines.

39.  Mobile Doctors uses a "carrot or stick" approach to get its physicians to order as many tests as possible.  Mobile Doctors offers a "carrot" to physicians who freely ordered testing by paying them increased bonuses based on the number of tests ordered.  Dr. Gezen learned how bonuses were paid by happenstance after he ordered some tests (which were medically indicated) and was told by a Mobile Doctors administrator that he was now eligible for an increased bonus.

40.  Mobile Doctors wields a "stick" against the physicians it deems to order too few tests by pressuring them to order more.  Dr. Gezen felt this pressure and Mobile Doctors staff cajoled him to order more tests.  In particular, when Dr. Gezen refused to order tests that he believed were not medically necessary, a Mobile Doctors' administrator asked him to go through his new patients' charts one by one to justify why he did not order tests or blood work.  Mobile Doctors' office manager also advised Dr. Gezen to note in the chart that the patient "refused" the testing (even though the patient did not) so that Mobile Doctors' CEO Ajiri would not know that Relator did not want to order the tests.

11

41. Mobile Doctors performs and bills Medicare for the testing that its physicians order regardless of whether the testing is medically necessary.

42. On November 11, 2012, Dr. Gezen wrote Mobile Doctors CEO Ajiri an e-mail in which he stated that Mobile Doctors' "system appears to promote and perhaps encourage unneeded tests and home visits at the expense of Medicare. These examples range from suggestions of tests being tied to bonuses...." In his November 13, 2012 e-mail in response, Mobile Doctors CEO Ajiri did not deny that "unneeded tests" were being ordered by Mobile Doctors. Instead, he asserted that "[n]o bonses [sic] are or have ever been tied directly to testing" and stated that Mobile Doctors gets reimbursed $150 for each echocardiogram in an apparent effort to minimize the lucrative reimbursements that Mobile Doctors was receiving from the testing it ordered.

43. In order to get reimbursed by Medicare for the provision of its services to each patient, Mobile Doctors is required to submit a claim for payment to Medicare. Specifically, Mobile Doctors is required to submit a CMS-1500 form, which among other things, identifies the dates and kinds of services provided and contains a certification that the information submitted is "true, accurate and complete" and the billed-for services were "medically indicated and necessary for the health of the patient."

44. Moreover, because Mobile Doctors submits its claims for payment to Medicare electronically, Mobile Doctors was required to complete an Electronic Data Interchange Enrollment Form. As part of that Enrollment Form, Mobile Doctors was required to certify that it would submit "accurate, complete, and truthful" claims and to further acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare or Section 1011 program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that

is required pursuant to this Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."

45. Every time Mobile Doctors billed Medicare for a medically-unnecessary test, Mobile Doctors made a false certification in support of its false or fraudulent claim in violation of the False Claims Act.

III.    Mobile Doctors Routinely Waives Deductibles and it Does Not
        Collect Copayments from its Medicare Patients.

46. Medicare Part B patients have to pay an annual deductible of $147 plus a co-payment of 20% of the Medicare-approved amount for most doctor services.

47. Mobile Doctors routinely waives the Medicare Part B deductibles for its patients. Moreover, although Mobile Doctors bills its patients for the co-payments, the company never collects the co-payments from the patients and it informs the patients that they need not make the co-payments when the issue arises.

48. Dr. Gezen has personal knowledge of these practices. On at least a dozen occasions during his patient home visits, Dr. Gezen heard his Mobile Doctors' Medical Assistants (who accompanied him on each home visit) tell Medicare beneficiaries that they did not have to pay the co-payments when the patients raised questions about the charges. A Mobile Doctors' patient also told Dr. Gezen that he switched to Mobile Doctors from his prior physician because he did not want to pay the Medicare co-payments.

49. Moreover, on November 11, 2012, Dr. Gezen wrote Mobile Doctors CEO Ajiri an e-mail in which he challenged Mobile Doctors' fraudulent practices. In his November 13, 2012 e-mail in response, Mobile Doctors CEO Ajiri admitted that Mobile Doctors waived the annual Medicare deductible for its patients.

50. Dr. Gezen, on the other hand, saw no evidence that Mobile Doctors engaged in a case-by-case review of an individual Medicare beneficiary's financial status before waiving the deductibles and co-payments. Instead, Mobile Doctors waived these charges as a matter of corporate policy for each and every patient.

51. The Anti-Kickback Statute prohibits offering or paying any remuneration to any person to induce such person to purchase any good or service for which payment may be made in whole or in part under a Federal health care program. *See* 42 U.S.C. §1320a-7b(b)(2)(B). Under the Anti-Kickback Statute, the term "remuneration" includes the routine waiver of co-payment and deductible amounts. 42 U.S.C. §1320a-7a(i)(6).

52. By routinely waiving the Medicare deductibles and co-payments for Medicare beneficiaries to induce them become and remain as Mobile Doctors' patients, Mobile Doctors has violated the Anti-Kickback Statute.

53. Under the Patient Protection Affordable Care Act of 2010, a claim that includes items or services resulting from a violation of the Anti-Kickback Statute constitutes a "false or fraudulent claim" for purposes of the False Claims Act. *See* 42 U.S.C. §1320a-7b(g).

54. Mobile Doctors' practice of routinely waiving deductibles and co-payments also results in Mobile Doctors' submission of falsely-inflated claims for payment to the Medicare Program. In particular, although Mobile Doctors files its claims with Medicare seeking reimbursement for the Medicare-approved value of the services it provides to Medicare beneficiaries, the actual amount of reimbursement that Mobile Doctors is entitled to claim is the Medicare-approved value of its service *less* the value of the co-payment or deductible that Mobile Doctors routinely and invariably waives.

55. Every claim submitted to Medicare by Mobile Doctors for services rendered to a patient for whom Mobile Doctors waived the patient's Medicare deductible and/or co-payment is a false or fraudulent claim in violation of the False Claims Act.

IV.  Mobile Doctor Improperly and Falsely Certifies and Recertifies Patients
     for Home Health Care in Exchange for the Continued Referral of Patients.

56. Mobile Doctors obtains all of its patients through referrals from Home Health Agencies.  In exchange for receiving these patient referrals and for receiving direct payments from the Home Health Agencies for the services it renders to a subset of the referred patients, Mobile Doctors improperly and falsely certifies patients referred to it by the Home Health Agencies as being eligible for "home health services."

57. "Home health services" are "items and services furnished to an individual, who is under the care of a physician by a home health agency," under a plan of care "established and periodically reviewed by a physician. *See* 42 U.S.C. §1395x(m).  Home health services include: (1) part-time or intermittent nursing care provided by or under the supervision of a registered professional nurse; (2) physical or occupational therapy or speech-language pathology services; (3) medical social services under the direction of a physician; (4) certain part-time or intermittent services of a home health aide; and (5) certain medical supplies and durable medical equipment while under such a plan. *Id.*

58. The Home Health Agencies cannot receive reimbursement from Medicare for their "home health services" rendered to a Medicare beneficiary without a physician certification that the beneficiary is "homebound" and in need intermittent skilled nursing services or other home health services.  In addition, a patient who is "certified" as in need for home health services

needs to be recertified every 60 days in order to remain eligible for Medicare-reimbursed home health services.

59. The "Requirements for Home Health Services" are set forth in 42 CFR 424.22(a), which requires, among other things, that: (a) "[h]ome health services were required because the individual was confined to the home except when receiving outpatient services"; (b) a "face-to-face encounter" with the individual Medicare beneficiary "must be performed by the certifying physician" (or by a specified "nonphysician practitioner" in conjunction with the certifying physician); and (c) that the certifying physician "must document the face-to-face encounter on the certification itself" by stating that "the condition for which the patient was being treated in the face-to-face patient encounter is related to the primary reason the patient requires home health services, and why the clinical findings of such encounter support that the patient is homebound and in need of either intermittent skilled nursing services or therapy services."

60. Rather than complying with these requirements, Mobile Doctors instructs its physicians to sign the certification forms bearing only the patient's name "in blank" after they have met with the referred patients. The Mobile Doctors' physician who signs the certification form does not see the form again prior to its submission. Instead, Mobile Doctors' non-medically-trained administrative staffers -- without any input from or consultation with the certifying physicians -- complete the physician certification form with information gleaned from the patients' charts.

61. Mobile Doctors certifies virtually all of the patients who are referred to it as being eligible for home health services. If Mobile Doctors does not do so, the Home Health Agencies will simply refer the patients to other physicians who will provide the certification and Mobile Doctors will lose the patient. Relator personally observed this practice. For example, Relator once certified a patient for hospice services instead of for home health services and the patient's

16

file was taken from Mobile Doctors by the Home Health Agency ("V-Care") and given to another physician's organization which certified the patient for home health services.

62.  Mobile Doctors' policy and procedure regarding these home health services certifications results in the improper certification of a significant number of these Medicare beneficiaries for home health services.  Indeed, Dr. Gezen (who inherited the vast majority of his patients from other Mobile Doctors' physicians) estimates that 15-20% of the patients that he treated at Mobile Doctors were ambulatory and not "homebound" and were therefore ineligible for "home health services."

63.  Mobile Doctors scheduled Dr. Gezen to have home visits with the following patients whom it falsely certified as being eligible for "home health services" when the patients in fact were ambulatory and not homebound:

    a.    F.T. -- Dr. Gezen had home visits with this patient on September 18, October 9, November 2, November 20, and December 4.[4]

    b.    S.D. -- Dr. Gezen had home visits with this patient on listed on October 9, October 26, and November 16.

    c.    E.W. -- Dr. Gezen had a home visit with this patient November 27.

    d.    Do.B. -- Dr. Gezen had home visits with this patient on September 17, October 28, and November 20.

    e.    Da.B. -- Dr. Gezen saw this patient on September 17, October 30, and November 20.

    f.    S.M. -- Dr. Gezen saw this patient on October 19 and November 16.

    g.    T.D. -- Dr. Gezen saw this patient on October 29 and November 27.

    h.    B.H. -- Dr. Gezen saw this patient on October 29, and November 27.

    i.    G.M. -- Dr. Gezen saw this patient on October 12.

    j.    H.F. -- Dr. Gezen saw this patient on listed on November 8.

---

[4] All dates are from 2012.

k.    A.B. -- Dr. Gezen saw this patient on listed on November 19.

l.    M.G. -- Dr. Gezen saw this patient on September 18, October 9, and November 2.

m.    C.C. -- Dr. Gezen saw this patient on September 27 and November 6.

n.    S.C. -- Dr. Gezen saw this patient on September 27.

o.    A.M. -- Dr. Gezen saw this patient on listed on the September 18, October 26, and December 4.

p.    J.C. -- Dr. Gezen saw this patient on September 20, October 8, November 1, and November 26.

q.    B.R. -- Dr. Gezen saw this patient on September 17, October 8, November 1, and November 26.

r.    M.B. -- Dr. Gezen saw this patient on November 5.

64.  In addition to receiving patient referrals, Mobile Doctors also receives payments directly from the Home Health Agencies for the services it renders to a small subset of the referred patients (5-10%) who are eligible under only under Medicare Part A and not under Medicare Part B. Since these patients are not eligible under Medicare Part B, Mobile Doctors cannot bill Medicare for the services that it renders to them. Instead, the Home Health Agencies (which are reimbursed under Medicare Part A) pay Mobile Doctors directly for the services that it renders to the patients.

65.  This "referral and payment in exchange for certification" scheme between the Home Health Agencies and Mobile Doctors violates the Anti-Kickback Statute, which prohibits any person from receiving remuneration in return for "arranging" for any service for which payment may be obtained from a Federal health care program. *See* 42 U.S.C. §1320a-7b(b)(1)(B).

66.  Dr. Gezen has personal knowledge that the Home Health Agencies made these direct payments to Mobile Doctors. Among other things, Dr. Gezen was instructed by Mobile Doctors

that he should not order testing for this subset of patients because the Home Health Agencies would have to pay for the tests. Dr. Gezen was also provided with maps with his daily schedules which marked the homes of the patients for whom Mobile Doctors were paid by the Home Health Agencies with "BHH" (*i.e,* bill home health). Dr. Gezen understood that the patient maps were marked with "BHH" to remind the Mobile Doctors physicians not to order tests for those patients.

67. Every claim submitted to Medicare by the Home Health Agencies who engage in the "referral and payment in exchange for certification" scheme with Mobile Doctors is a false or fraudulent claim in violation of the False Claims Act.

V.   Mobile Doctors Causes the Submission of False or Fraudulent Claims for
     Prescription Medications that are Not Medically Necessary.

68. Mobile Doctors has a protocol of pressuring its physicians to automatically reauthorize all medications that its physicians prescribe regardless of whether the continued prescription of those medications is still medically appropriate.

69. In particular, Mobile Doctors issues prescriptions for its patients through Home Script Pharmacy, Inc., a company that offers free delivery of prescription drugs to Medicare patients. Home Script, which has an office within Mobile Doctors' Chicago headquarters, fills Mobile Doctors prescriptions and it delivers the medication directly to the patients' homes. Home Scripts asserts on its website that it bills Medicare Part D, Medicaid, and private insurance for the prescriptions that it fills.

70. As Medicare beneficiaries, Mobile Doctors' patients are eligible to receive prescription drug coverage through Medicare Part D.

71. Mobile Doctors has a protocol of placing prescription renewal slips for its patients' medication into its physicians' boxes so that the physicians can reauthorize the prescriptions. Mobile Doctors follows this protocol even when the prescription medication that its patients are taking is no longer necessary or is, in fact, harmful to the health of its patients.

72. Dr. Gezen has personal knowledge of this protocol. Mobile Doctors' administrative staff placed prescription renewal slips for medications in Dr. Gezen's box to be signed even when Dr. Gezen had noted in a patient's chart that those medications were to be discontinued. Dr. Gezen later asked the administrative staff not to place anymore of the prescription renewal sheets in his box and to only process prescriptions and renewals that he personally authorized. Dr. Gezen has also made home visits to Mobile Doctors' patients who have had stockpiles of unnecessary prescription medicines. Dr. Gezen has seen another Mobile Doctors' patient who wrongfully diverted controlled substances to a family member by taking advantage of Mobile Doctors' reckless practices. Some Mobile Doctors' patients have even gone so far as to ask Dr. Gezen to stop the shipment of prescription medications that they no longer needed.

73. In some instances, Mobile Doctors' protocol regarding the renewal of prescription medications that are no longer medically necessary is dangerous to its patients' health. For example, Mobile Doctors' protocol resulted in the continued renewal of diabetes medications for diabetic patients whose A1C (*i.e.,* blood glucose) levels were below medical standards according to authoritative medical protocols. As a result, those patients could have developed symptoms of hypoglycemia if Dr. Gezen had not interceded and they continued to take the medications. When Dr. Gezen brought this dangerous situation to the attention of defendant CEO Ajiri in a November 11, 2012 e-mail, Ajiri (in his November 13 response) did not deny that the complained of practice was occurring; rather, he merely noted the need for improvement at Mobile Doctors.

74. Mobile Doctors' protocol of pressuring its physicians to renew prescription medications for its patients regardless of whether those medications are still medically appropriate causes Home Scripts to submit false or fraudulent claims to Medicare for medically-unnecessary prescriptions. Furthermore, Mobile Doctors' orders for medically-unnecessary prescriptions are false statements/records that are material to Home Script's false or fraudulent claims to Medicare for medically-unnecessary prescriptions.

## Count I: False Claims Act, 31 U.S.C. §3729 *et seq.*

75. Relator incorporates each of the paragraphs in this complaint as though fully set forth herein.

76. As set forth above, defendants, by and through their divisions, subsidiaries, affiliates, officers, agents, and employees, knowingly presented, or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

77. By virtue of the acts described above, defendants, by and through their divisions, subsidiaries, affiliates, officers, agents, and employees, knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. §3729(a)(1)(B).

78. Defendants acted knowingly, by possessing actual knowledge or acting in deliberate ignorance or reckless disregard of the false or fraudulent nature these claims, records, or statements.

79. As a result of defendants' conduct, the United States of America suffered damages.

WHEREFORE, Burak Gezen, on behalf of himself and on behalf of the United States of America, prays that:

1. this Court enter judgment against defendants in an amount equal to three times the amount of damages the United States of America has sustained, plus a civil penalty of $11,000 for each violation of 31 U.S.C. §3729;

2. Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d);

3. Relator be awarded all reasonable attorneys' fees, costs, and expenses;

4. this Court award prejudgment and post-judgment interest; and

5. the United States of America and Relator receive all other relief, both at law and at equity, to which they are entitled.

Respectfully submitted,

_____
Jeffrey I. Cummings
One of the Attorneys for Plaintiff-Relator

Miner, Barnhill & Galland
14 W. Erie St.
Chicago, IL 60654
(312) 751-1170

## CERTIFICATE OF SERVICE

Lisa Mecca Davis certifies that she caused a copy of the foregoing Complaint to be served upon those listed below, by first-class mail, proper postage prepaid, this 26th day of February:

The Honorable Eric H. Holder, Jr.  
United States Attorney General  
U.S. Department of Justice  
950 Pennsylvania Avenue, NW  
Washington, DC 20530

Gary S. Shapiro, Esq.  
Acting U.S. Attorney  
Northern District of Illinois  
Eastern Division  
219 S. Dearborn St., 5th Fl.  
Chicago, IL 60604


_____  
Lisa Mecca Davis